[No. 11470.  Department Two.  November 28, 1913.]

WASHINGTON-OREGON CORPORATION et al., Respondents, v. THE CITY OF CHEHALIS et al., Appellants.[1]

MUNICIPAL CORPORATIONS—IMPROVEMENTS—BONDS—SPECIAL FUND —VALIDITY.  Where a city water system was to be paid for by an issue of $70,000 in general bonds of the city, and the balance, estimated at $115,000, by special water fund bonds payable out of the revenues of the water system, a special fund created to take care of the matter, by the payment of a fixed sum each month out of the revenues of the plant, is not invalid from the fact that such monthly payments are to be made from a collection fund having in it other moneys than revenues from the plant, where such revenues can be readily segregated, and the special fund was created in all respects as required by Rem. & Bal. Code, § 8008, providing that the council shall have the power to create a special fund for the sole purpose of defraying the cost of any public utility, in which special fund the city may be obligated to set aside a fixed proportion of the gross earnings of the utility or a fixed amount without regard to any fixed proportion, and to issue bonds or warrants payable out of such fund; since it would not be assumed that the special fund bonds would at some future time be paid from any part of the fund not derived from revenues.

SAME—BONDS—"SALE."  Under Rem. & Bal. Code, § 8007, providing that general fund bonds may be sold in such manner as the corporate authorities shall deem best, a city may provide, in letting a contract for water works, that the bonds may be delivered to the contractor in payment for the work; such a transaction being a "sale" within the meaning of the act.

SAME—CONTRACTS—LOANING OF CREDIT—WARRANTS.  An agreement in a contract for the construction of city water works providing that warrants are to be issued to the contractor during the progress of the work, and exchanged for special fund bonds, when issued, is not a loaning of the credit of the city; but a mere issuing of a certificate acknowledging a preexisting debt.

[1]Reported in 136 Pac. 681.

Appeal from a judgment of the superior court for Lewis county, Wright, J., entered March 15, 1913, in favor of the plaintiffs, in an action for injunctive relief, after a trial to the court. Reversed.

*W. A. Reynolds* and *F. D. Oakley* (*J. A. Shackleford*, of counsel), for appellants.

*Forney & Ponder* and *Charles A. Johns*, for respondents.

Morris, J.—The lower court in this action enjoined the city of Chehalis from entering into a contract with W. H. Mitchell providing for the construction of a municipal water system, and from any delivery of general bonds of the city authorized by ordinance, and an election in payment for the construction of such system. From this judgment, the city appeals.

The facts out of which the controversy between appellants and respondents arose are these: The city, on March 25, 1912, passed an ordinance providing for the submission to the qualified voters of the city of a plan for the construction of a municipal water plant. The plans upon which the system was to be constructed were set forth in detail. The cost of the system was estimated at $185,000, and it was provided that this cost should be met by an issue of $70,000 in general bonds of the city, bearing interest at not exceeding six per cent, and payable after the expiration of ten years, and a further issue of $115,000 in special water fund bonds, bearing the same rate of interest, payable out of revenues of the water system, at different dates ranging from five to seventeen years. The ordinance, with its proposed features of construction and payment, was submitted to a vote of the people, and was ratified by more than the requisite three-fifths vote. The city thereupon advertised the sale of both bond issues, and called for bids for the construction of the plant, providing in the call that the contractor would be paid by the issuance to him of $70,000 general fund bonds, and so much of the $115,000 issue of special fund bonds as should be necessary to complete

payment. No bids were obtained for the special water fund bonds, and no bid acceptable to the city was obtained for the general fund bonds. A bid of W. H. Mitchell for the construction of the plant for $161,750, being satisfactory to the city, was accepted, and the city was about to contract with him for the construction of the plant and for the delivery to him of the $70,000 general fund bonds and so much of the special water fund bonds as would be required to meet the balance of his bid, when this action was brought, with its resulting injunction.

The judgment of the court below was based upon a holding that portions of the ordinance are invalid. Under § 8 of the ordinance No. 14a, which is the portion referred to by the lower court, it is proposed to create two funds. The first of these funds is known as "The Newaukum River gravity water system of Chehalis fund." The second fund is known as "The Newaukum River gravity water system of Chehalis bond fund." The ordinance provides that, into the first named fund, are to be paid the proceeds of all bonds sold and the entire gross revenues of the water system, including a fair charge for water used by the city for all municipal purposes, together with such other funds as the city may see fit to transfer thereto. Out of this fund, is to be paid the entire cost of constructing and maintaining the water system, together with the special fund bonds with the interest thereon. The second fund is one created out of the first named fund by transferring from it into the second named fund, on the 20th of each month after the issuance of the water fund bonds, a fixed sum out of the revenues of the plant in order to take care of the interest and principal of the special water fund bonds as the same matured. The first of these funds was held valid by the court; the second was held to be invalid. No further reference, therefore, need be made to the first fund.

The second fund is held to be invalid upon the ground that the money out of which it is created, and which is to be used for payment of special bonds, is derived from transfers from

the first fund which may have other moneys in it than those
derived from the revenues of the water system. The mere
fact that the gross revenues of the water system are paid into
the first fund, together with moneys derived from other
sources, and that the second fund is created out of the first
fund by setting aside from the first fund a fixed sum derived
from the revenues of the plant to take care of the principal
and interest of the special fund bonds, does not suggest to us
any reason for holding the second fund invalid. The creation
of funds of this character is provided for in Rem. & Bal. Code,
§ 8008 (P. C. 77 § 1078), providing that the common council
shall have power to create a special fund for the sole purpose
of defraying the cost of any public utility, in which special
fund the common council or other authorities of the municipal-
ity may obligate the city to set aside and pay a fixed propor-
tion of the gross revenues of the utility, or any fixed amount
out of and not exceeding a fixed proportion of such revenues,
or a fixed amount without regard to any fixed proportion,
and to issue and sell bonds or warrants bearing interest not
to exceed six per cent, such bonds to be payable only out of
such special fund. In creating such special fund, the corpor-
ate authorities shall have regard to the cost of operation of
the plant or system, and to any proportion or part of the
revenues previously pledged as a fund for the payment of
bonds, warrants, or other indebtedness, and shall not set aside
into such special fund a greater amount or proportion of the
revenues than in their judgment will be available over and
above the cost of maintenance and operation and the amount
or proportion, if any, of the revenues so previously pledged,
such bonds or warrants issued against such fund being a valid
claim only against said fund, and not a general indebtedness
of the municipality; such bonds to be sold in such manner as
the corporate authorities shall deem for the best interests of
the city or town, and the corporate authorities may provide in
any contract for the construction and acquirement of the pro-
posed improvement that payment therefor shall be made only

in such bonds or warrants at par value thereof.  The provisions of the ordinance with reference to this second fund follow these requirements of the statute, and the issue submitted to the people for their acceptance or rejection specially provided that the special bonds should be payable solely from the fund created out of the revenues of the water system.  Inasmuch, therefore, as the scheme proposed and adopted is within the provisions of the statute, we shall not assume that the municipal authorities will, at some indefinite future time, do an illegal act by paying these special fund bonds with money not wholly derived from the revenues of the water system.  Nor is there, so far as we can observe, any difficulty in determining the amount of money in the first fund derived from the revenues of the plant that should be segregated from this fund and transferred to the second fund.  The first fund is merely a collection fund.  It will not be a difficult matter to segregate the money that should be transferred into the second fund; and when so segregated and transferred, a fund is created out of which the special bonds are payable as provided by law.  We, therefore, cannot concur in the conclusion of the court below that the portion of the ordinance creating this second fund is invalid.

The main attack made by respondents upon the validity of the ordinance and the proposed Mitchell contract is that the city cannot, in law, exchange its general fund bonds in payment of the amounts to become due for material and construction under the Mitchell contract, upon the ground that the statute requires the bonds to be sold for cash and out of the fund derived from such sale the contractor shall be paid his due; and, second, that the provision of the Mitchell contract providing for the delivery to him of warrants to be later exchanged for bonds, when the latter are printed and ready for delivery, is a lending of the city's credit in violation of the constitutional provision.  That part of the contract attacked by these contentions is, first, a provision in the specifications for the proposed water system that all bids should be sub-

mitted with the understanding that the contractor would re-
ceive in payment for the material and work the $70,000 in
general bonds and so much of the special bond issue
as would be required to meet the balance of his bid, the bonds
of each class to be taken at their face value. It was further
provided that, if for any reason the city should be unable to
issue and deliver bonds as payments became due, the city would
issue warrants for the amount due, to be exchanged for bonds
as soon as the bonds were prepared and ready for delivery,
and not later than fifty days after the completion and accept-
ance of the work. Rem. & Bal. Code, § 8007 (P. C. 77
§ 1077), referring to general fund bonds issued by any mu-
nicipality, provides that, "Such bonds shall be sold in such
manner as the corporate authorities shall deem for the best
interest of the city." We find in this language no limitation
upon the power of the city to deliver the bonds to the con-
tractor in payment for the construction of the water plant.
If the statute required the bonds to be sold in any particular
manner, no sale, unless in the manner provided in the statute,
would be valid. But our statute contains no requirement of
this character. It provides only for the sale of the bonds in
such manner as the corporate authorities shall deem best,
thus vesting in them a discretion as to the method of sale or
disposal. Because the statute uses the word "sale" does not
necessarily imply that the bonds can only be disposed of for
cash and the cash thus obtained paid to the contractor.
Tiedeman, in his work on Sales, § 12, says:

"Although it has been sometimes held that the sale must
be a *transfer for money*, and that every other transfer is an
exchange or barter, the better opinion is that the transac-
tion is still a sale, although the transfer is made for some-
thing else than money, provided each article is transferred
at an agreed or market value, so that the one thing is received
in payment of the price of the other."

In so far as this definition would make the contract between
the city and the contractor a sale of the bonds because the

bonds and the construction were exchanged at an agreed valu-
ation, the bonds at their face value, and the construction at
the price bid and accepted, it is supported by the authorities.
A statute of New Jersey authorized township commissioners
to issue and dispose of bonds in aid of railway construction
at not less than par, and that the money so raised by any
loan or sale of the bonds should be invested in bonds of the
railway company. The commissioners, instead of selling the
bonds and investing their proceeds in bonds of the railway
company, exchanged them for a like amount of the railway
company bonds, and it was held to be a compliance with the
statute. *Montclair v. Ramsdell*, 107 U. S. 147. A like rul-
ing was made in *Cady v. Watertown*, 18 Wis. 338, constru-
ing a statute authorizing the commissioners to negotiate the
sale of bonds and use the proceeds in purchasing sites for
schoolhouses and other purposes. The commissioners ac-
cepted a deed from Cady and delivered to him bonds in pay-
ment. It was contended that the commissioners, under the
act, had no power to dispose of the bonds except by sale for
cash. This contention was overruled, the court saying in its
holding that there was nothing in the act which required the
sale of the bonds for cash; that the exchange of them for
school sites was a sale of them within the meaning of the law,
and that it was not a departure from the power to negotiate
a sale to pay for the property purchased in these securities
without resorting to the idle ceremony of first selling the
bonds for cash and then paying the money so received to the
owner of the site. A third case in point is *O'Neill v. Yellow-
stone Irr. Dist.*, 44 Mont. 492, 121 Pac. 283, where a statute
providing for the issuance of bonds for an irrigation district
declared that the bonds so issued should be sold. The court
held that this imposed no restriction upon the district com-
missioners in exchanging the bonds for water rights, rights
of way, etc., the court saying: "  .  .  .  an exchange of
the bonds of the district for the property of the company at
its cash value was a sale of them, the same as if they had been

sold for cash, . . ." Other supporting authorities are: *Germania Sav. Bank v. Town of Darlington*, 50 S. C. 337, 27 S. E. 846; *Meyer v. Muscatine*, 1 Wall. 384; *Wiley v. Board of Education*, 11 Minn. 371; Harris, Municipal Bonds, n. 342; McQuillin, Municipal Corporations, § 2303.

Although not cited nor referred to by either counsel, we think our ruling in *Kinkade v. Witherop*, 29 Wash. 10, 69 Pac. 399, may be regarded as authority for the principle involved in our present holding. An irrigation district was there in debt to a contractor for work on its canal, and in payment of his claim delivered to him its bonds. The statute, authorizing the organization of irrigation districts and the issuance of bonds as amended in Laws of 1895, page 432, authorized commissioners of the district to sell the bonds and raise money for necessary construction. These bonds so delivered to the contractor were attacked on several grounds, one of which was that they were not paid for in cash. Upon this point the court said: "If the statute contemplated or required a sale for cash, we think the transaction between the parties amounted to that."

As to special fund bonds, no question is raised but that, under § 8008, above quoted, the city was authorized to deliver these bonds to the contractor in payment of the work. The court below based its conclusion as to the general fund bonds, and the conclusion is sought to be upheld here, upon the authority of *Hansard v. Green*, 54 Wash. 161, 103 Pac. 40, 132 Am. St. 1107, 24 L. R. A. (N. S.) 1273. From the facts in that case, it appears that the town of Harrington borrowed $22,000 from a local bank and purchased a water system, agreeing with the bank that the town would thereafter execute and deliver to the bank its bonds in a like amount in payment of the loan. An injunction was sought to enjoin the commissioners from executing and delivering the bonds. The town made no appearance, and its default was entered. The bank then intervened, alleging its contract

with the town.   The court below denied the injunction and
rendered judgment in favor of the intervener.   This judg-
ment was, on appeal, reversed by us upon the ground that
the right to issue bonds and dispose of them was a legislative
function which the courts could not usurp by directing their
issuance and delivery to any person.   In discussing this
ruling, it is said:

"We know of no rule of law which permits a municipal cor-
poration to contract a debt upon an agreement to issue bonds
to cover it.   To so hold in this case would be equivalent to
holding that the court had the right and power to say that
the contract should be executed—the bonds sold to interveners
—when the right is reserved to and the duty put upon the
corporate authorities to sell them in such manner as they
should deem for the best interests of the town (Bal. Code,
§ 1077), and thus by judicial decree usurp and exercise a
legislative function.   It is within the power of the city or
town to purchase a water works system and to issue its bonds
to raise money to pay therefor, but it cannot contract a
bond issue in advance of its authorization, and deliver them,
over the challenge of a taxpayer.   The bond must be in
existence before it can be delivered or become an object of
barter and sale.   .   .   .   To hold that a party advancing
money at the request of the officers of a municipal corpora-
tion, upon their promise to reimburse the creditor by an
issue of its negotiable bonds, can acquire a right of action
would defeat both the purpose and spirit of the law."

It will thus be seen that no point here involved was there
discussed.   We are, for these reasons, of the opinion that the
arrangement between the city and the contractor is a sale of
the bonds within the meaning of the statute, and that the
lower court was in error in holding this arrangement vitiated
the contract.

The next contention is that the agreement in the contract,
whereby warrants are to be issued to the contractor during
the progress of the work, to be exchanged for bonds when is-
sued, infringes upon the constitutional provision prohibiting

a municipality from loaning its credit to a private individual. We cannot perceive how under this arrangement the city is loaning its credit. The contractor obtains nothing upon the credit of the city. The city, recognizing an indebtedness to him which it has contracted to pay by the delivery of bonds, agrees that, in case the bonds are not ready for delivery as the money is earned, it will recognize the claim by issuing its warrants, to be exchanged for bonds when the bonds are ready for delivery. The bonds have already been authorized, and the only thing remaining is the ministerial act of their preparation. If for any reason this is not done, the contractor is not to go empty-handed, but is to receive a recognition of the indebtedness in the form of a promise to pay, to be later exchanged for the payment agreed upon. A city warrant is nothing more than a device for liquidating an existing municipal indebtedness or a certificate of indebtedness, which is neither intended to nor does create any new debt. 2 Dillon, Municipal Corporations (5th ed.), § 851; McQuillin, Municipal Corporations, § 2241. To issue a certificate of indebtedness acknowledging a preexisting debt is in no sense to loan credit. In *Moran v. Thompson*, 20 Wash. 525, 56 Pac. 29, cited by respondents, it was held that a contract providing for the issuance of city warrants in payment of certain contract work, bearing interest from date, the contractor agreeing to refund to the city all such sums it had paid or incurred liability to pay as interest between the date of the issuance of the warrants and the final completion of the work, together with five per cent interest upon all sums paid as interest, was nothing more than a loan of credit and a violation of the constitutional provision. It will be readily seen that, under the contract there involved, the city was advancing money to be thereafter returned to it with interest— a loan under any definition. No agreement of that character is involved in this case, and without further discussion of the point, it is our opinion it should be overruled.

Believing, for these reasons, the lower court was in error, the judgment is reversed.

Crow, C. J., Parker, Mount, and Fullerton, JJ., concur.